IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MIRANDA J-T.,[1]  )
 )
       Plaintiff, )
 )
vs. ) Case No. 19-cv-076-DGW[2]
 )
COMMISSIONER of SOCIAL )
SECURITY, )
 )
       Defendant. )

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for disability benefits in April 2015, alleging disability as of January 25, 2011. She later amended her onset date to January 1, 2014. After holding an evidentiary hearing, an ALJ denied the application on October 3, 2017. (Tr. 206-219). The Appeals Council denied review, and the decision of the ALJ

---

[1] In keeping with the court's recently adopted practice, plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 8 & 15.

became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issue Raised by Plaintiff

Plaintiff argues that the ALJ's assessment of her subjective statements was erroneous because he relied on misrepresented facts and ignored probative information.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled.  A negative answer at any step, other than at step three, precludes a finding of disability.  The plaintiff bears the burden of proof at steps one through four.  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve

conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. She was insured for DIB through December 31, 2017.

The ALJ found that plaintiff had severe impairments of degenerative disc disease of the cervical and lumbar spine; migraine headaches; lower extremity deep vein thrombosis; fibromyalgia; multiple sclerosis; hypertension; depression; and anxiety.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the sedentary exertional level limited to no climbing of ladders, ropes, or scaffolds; only simple, routine, and repetitive tasks where supervision is simple, direct, and concrete for the worker and SVP [specific vocational preparation] 1 or 2 that can be learned in 30 days; no interaction with the public; and not more than occasional changes in the workplace setting.

Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not able to do her past work as a store manager or customer service representative, but she was able to do other jobs that exist in significant numbers in

the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to plaintiff's argument.

1. **Agency Forms**

Plaintiff was born in 1975. She was 42 years old on the date of the ALJ's decision. A prior claim had been denied as of March 17, 2014. (Tr. 466-467).

In September 2015 plaintiff reported that she was unable to work because she was unable to stand or sit for very long, she dropped things, and headaches made it impossible to concentrate or even keep her eyes open for long. Her husband did the cooking, housework, and yard work. She had to use a cane or walker at all times. They were prescribed by a doctor in March 2015. She took Oxycodone, which caused side effects of tolerance, constipation, nausea, and dizziness. (Tr. 508-515).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in May 2017. (Tr. 228).

Plaintiff testified that she was unable to work because of "being constantly nauseated," which caused her to not eat and become dehydrated, and frequent headaches sometimes lasting two to three days. She used a walker when she had

trouble walking. Oxycodone took the edge off her pain and she had no side effects. (Tr. 235-237).

Plaintiff's husband helped her with showering. He did the cooking and cleaning, but she tried to help when she had a good day. He normally did the grocery shopping; she went with him very rarely. She had no significant activities outside the home. (Tr. 238-240).

Plaintiff had twelve to fifteen migraines a month. It took her a day or two to recover. During a headache, she had to lie down in a cold, dark, quiet place. (Tr. 241-242). A CT scan found a lesion on her brain, which could possibly be related to MS. (Tr. 245).

She was diagnosed with gastroparesis in 2016.[4] She sometimes had diarrhea and sometimes constipation. Various treatments had been tried. (Tr. 243-244).

She had chronic deep vein thrombosis in her left leg which caused balance problems. (Tr. 246).

She had bulging discs in her neck and back for which she had injections. (Tr. 248-249).

### 3. Medical Records

Plaintiff received primary health care at Sherwood Urgent Care. She was

---

[4] "Gastroparesis is a condition that affects the normal spontaneous movement of the muscles (motility) in your stomach. Ordinarily, strong muscular contractions propel food through your digestive tract. But if you have gastroparesis, your stomach's motility is slowed down or doesn't work at all, preventing your stomach from emptying properly." https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787, visited on August 5, 2019.

seen there in July 2014 for anxiety and trouble sleeping. She had chronic back pain and was in pain management. Exam showed tenderness to palpation of the lumbar spine and paraspinous muscles, pain with twisting, reaching and bending, and positive straight leg raising bilaterally. The primary diagnosis was chronic pain. (Tr. 984-985). A week later, she was admitted to the hospital overnight. She went to the emergency room after she passed out while backing her car out of the driveway. She had a history of depression and chronic pain. She had recently been taking increased amounts of Ambien and Ativan. The final diagnoses were (1) adjustment disorder, (2) rule out mood disorder due to various causes, (3) sleep disorder, and (4) rule out factitious disorder "wanting disability."[5] (Tr. 886, 900).

In January 2015, an exam at Sherwood Urgent Care showed back pain with twisting, bending, and reaching, tenderness in the lumbar spine, and positive straight leg raising. (Tr. 981). She was seen for a migraine in February and was given Imitrex and Fioricet. (Tr. 978).

In March 2015, she was seen at Sherwood for worsening anxiety attacks. She had been having migraines. Physical exam was normal. She was prescribed Ativan for anxiety and Fioricet for migraines. (Tr. 970-971). Five days later, she was seen again after having been in a motor vehicle accident. She was in a

---

[5] "Factitious disorder is a serious mental disorder in which someone deceives others by appearing sick, by purposely getting sick or by self-injury. . . . Factitious disorder is not the same as inventing medical problems for practical benefit, such as getting out of work or winning a lawsuit. Although people with factitious disorder know they are causing their symptoms or illnesses, they may not understand the reasons for their behaviors or recognize themselves as having a problem." https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028, visited on August 5, 2019.

wheelchair and musculoskeletal exam showed limited range of motion due to pain but no obvious abnormalities. (Tr. 967-968). In April 2015, she was "frustrated" because she was not being given pain medication. She had a migraine. The advanced practice nurse at Sherwood wrote that she "[d]iscussed with [plaintiff] and her husband that I would not write any medications for pain because of the number they have received recently." She agreed to give plaintiff a referral to pain management. (Tr. 954-955).

Plaintiff began seeing Dr. Ghaleb, a pain management specialist, on April 16, 2015. Her chief complaint was pain in the neck and arms. Dr. Ghaleb gave her an epidural injection in May 2015. (Tr. 999, 1030-1033).

She was hospitalized in September 2015 for intractable vomiting. She denied illicit drug use but tested positive for cannabinoids. She improved with IV fluids and antiemetic medication. Testing showed moderate gastritis. The cause of the nausea and vomiting was unknown. It could have been cannabis abuse or gastritis or fibromyalgia flare-up. (Tr. 2428-2429).

Dr. Manchikanti, a pain management specialist, saw plaintiff in February 2016. She told him that her husband had gotten a job and she was going to have health insurance soon. (Tr. 2589). In March, a cervical CT scan was normal. (Tr. 2245). In May, she told Dr. Manchikanti that her husband had lost his job, so she was presumably going to lose her insurance. He prescribed Neurontin, Tizanidine, and Percocet. (Tr. 2585-2588).

Plaintiff was admitted to the hospital in July 2016 because of chronic deep

vein thrombosis in the left leg. In the discharge summary, the doctor wrote that she had been diagnosed with DVT about a month ago. He wrote that she had presented to the emergency room with complaints of leg pain and "she is probably faking it to get pain medications." He noted that she had been to the hospital three times with the same problem and had been prescribed Lovenox bridged with Coumadin. She said she took the medications, but her INR level was subtherapeutic, so the doctor thought "she is probably spitting out the Coumadin." (Tr. 1611).

Dr. Amar Sawar, a neurologist, saw plaintiff for the first time in August 2016, when she was hospitalized after a possible transient ischemic attack. He then saw her in his office in October 2016. He noted her long history of a number of complaints, including headaches, neck and low back pain, and numbness, tingling, and burning in her hands and feet. Exam showed no spinal tenderness and negative straight leg raising. She had full strength and gait was normal. Sensation was decreased to pinprick in both feet up to the ankles. She had a number of tender points. He ordered several tests. (Tr. 2529-2533).

Plaintiff went to the emergency room at Heartland Regional Hospital in November 2016 complaining of a pounding headache for three days with double vision. Dr. Sawar was called, and he asked that she be admitted. (Tr. 2468-2470). Dr. Sawar saw her at the hospital and diagnosed basilar-type status migrainosus, fibromyalgia, major depression, and generalized anxiety disorder. (Tr. 2546).

Plaintiff was seen at Prairie Cardiovascular Consultants in February 2017. She was in a wheelchair with dysarthric speech. She was described as frustrated due to inability to communicate. Distal pulses were not palpable, and her blood pressure could not be recorded. (Tr. 2606-2607). Abdominal and chest CT scans and angiograms as well as an echocardiogram were normal. (Tr. 2597, 2598, 2603, 2609). The next month, a cardiologist suggested her condition was possibly related to POTS (postural orthostatic tachycardia) or multiple sclerosis. (Tr. 2614).

Plaintiff saw Dr. Sawar again in his office on July 25, 2017. His note says that he had seen her at Heartland Regional on July 15, 2017, for "possible lupus." She had been admitted with fever, nausea, vomiting, and abdominal pain. She was transferred to St. Louis University Hospital for further evaluation. (The records from these two hospitalizations were not before the ALJ.) The July 25 office exam showed decreased sensation to pinprick in both feet up to the ankles, a number of tender points, erythematous round lesions on the cheeks, erythematous rash of the upper extremity, and malar rash in a butterfly distribution. He diagnosed systemic lupus erythematosus, restless leg syndrome, low back pain, neck pain, and fibromyalgia.[6] (Tr. 2634).

Dr. Sawar's treatment plan was for plaintiff to see an ophthalmologist and, if

---

[6] "Systemic lupus erythematosus (SLE), is the most common type of lupus. SLE is an autoimmune disease in which the immune system attacks its own tissues, causing widespread inflammation and tissue damage in the affected organs. It can affect the joints, skin, brain, lungs, kidneys, and blood vessels." https://www.cdc.gov/lupus/facts/detailed.html#sle, visited on August 6, 2019.

the eye exam was clear, plaintiff would begin taking Plaquenil. She would have to be examined by an ophthalmologist every six months "to monitor Plaquenil toxicity." She was also to start Prednisone, continue taking Nortriptyline, and get lab work done.[7] (Tr. 2635).

### 4. Medical Records Not Before the ALJ

Plaintiff submitted additional records to the Appeals Council in conjunction with her request for review. Those records (Tr. 13-202) cannot be considered here. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994).

## Analysis

Plaintiff takes issue with the ALJ's assessment of the reliability of her subjective statements.

The "credibility findings" of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative

---

[7] Plaquenil is a drug used to treat lupus. A possible side effect is damage to the retina. https://www.aao.org/eye-health/drugs/what-is-plaquenil, visited on August 6, 2019.

credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 16-3p, effective March 28, 2016, superseded SSR 96-7p on evaluating the claimant's statements about her symptoms. SSR 16-3p does not change the prior standard; rather, it emphasizes that:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. . . .

SSR 16-3p, 2016 WL 1119029, at *10.

As did SSR 96-7p, the new SSR requires the ALJ to consider the entire record, and to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, at *7.

The ALJ is required to give "specific reasons" for his evaluation of plaintiff's statements. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Ibid.* See also, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the

adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9.

Here, the reasons given by the ALJ for rejecting plaintiff's statements are not supported by the record and are not valid.

The ALJ said that plaintiff's daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." Citing to a Function Report filed in September 2015 (Ex. 9E), the ALJ said that plaintiff attends to her personal care with assistance, rides in a car, drives, shops, pays bills, counts change, handles a savings account, uses a checkbook, reads, and watches television. (Tr. 213). There are two problems with the ALJ's reliance on these activities. First, none of these meager activities, even taken together, conflict with plaintiff's description of her symptoms and limitations. See, *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), as amended (Dec. 13, 2000) ("[M]inimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity.") In addition, the ALJ cited only to the Function Report, seemingly ignoring plaintiff's testimony at the hearing, and was quite selective in describing her activities as reported. Plaintiff said in the

Function Report that she rode in a car, but "car rides even to the doctor's office are painful." She did not check the box for "drive a car." She said she shops twice a month, using a motorized cart in the store. She said that her husband did all the cooking, housework, and yardwork. The ALJ offered no explanation for why plaintiff's meager activities, even as described by him, are not what "one would expect" of a person with her alleged symptoms.

The ALJ's second reason for not believing plaintiff was that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." (Tr. 213). However, he mischaracterized and cherry-picked the medical evidence in his analysis.

The ALJ referred to several doctors' notes describing plaintiff as not in distress, well-nourished, and having a regular heart-rate without murmur, gallop, or thrill. These findings do not contradict plaintiff's claims. He also noted several exams on which plaintiff had a full range of motion of the spine no tenderness, and sensation was intact. He neglected to mention most of the visits, detailed in the above summary of the medical evidence, where plaintiff was noted to have tenderness and limited range of motion of the spine. Further, none of the findings he highlighted contradict plaintiff's allegations of migraine headaches. The ALJ fails to build the requisite logical bridge between the evidence and his conclusion where he relies on evidence which "does not support the proposition for which it is cited." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

Most glaringly, the ALJ's discussion of the last visit with Dr. Sawar was so

selective as to be misleading. He said only that plaintiff saw the doctor for possible lupus with fever, nausea, vomiting, and abdominal pain, and that the plan was for plaintiff to see an ophthalmologist for follow-up. (Tr. 215). In fact, Dr. Sawar had seen plaintiff for "possible lupus" a week earlier, when she had been admitted to the hospital with fever, nausea, vomiting, and abdominal pain. (Tr. 2634). The ALJ did not mention that hospitalization. He did not mention that, at the last visit, Dr. Sawar observed decreased sensation to pinprick in both feet up to the ankles, a number of tender points, erythematous round lesions on the cheeks, erythematous rash of the upper extremity, and malar rash in a butterfly distribution. He ignored Dr. Sawar's diagnoses, including systemic lupus erythematosus. And, he mischaracterized Dr. Sawar's treatment plan. Seeing an ophthalmologist was just the beginning; if her eye exam was clear, Dr. Sawar planned to treat her lupus with Plaquenil. He also prescribed Prednisone, Nortriptyline, and additional lab work. The Commissioner repeats the ALJ's selective description of the last visit with Dr. Sawar without comment in his brief. See, Doc. 24, p. 6.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). That is what the ALJ did here.

None of this is to say that the ALJ was required to believe plaintiff's allegations. However, he was required to assess the reliability of her claims based

on an accurate and evenhanded review of her activities and the medical evidence.

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The Court must conclude that the ALJ failed to build the requisite logical bridge here.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** August 9, 2019.

**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**